UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERICA HAHN, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| GARTNER, INC., | : |
| | : |
| Defendant | : |
| | : |

MAY 7, 2019

## COMPLAINT

Erica Hahn ("Plaintiff" or "Ms. Hahn") submits the instant Complaint against Gartner, Inc. ("Defendant" or "Gartner"), alleging claims for: (1) gender discrimination pursuant to Title VII of the 1964 Civil Rights Act ("Title VII"); (2) retaliation for protected activities under the Connecticut whistleblower statute (Conn. Gen. Stat. § 31-51m et.seq.) and, (3) breach of the covenant of good faith and fair dealing.

**I.    PARTIES**

1.    Plaintiff Erica Hahn is a citizen of the State of Florida.

2.    Defendant Gartner is a is domestic corporation organized under the laws of Delaware, with headquarters in Stamford, Connecticut.

**II.    JURISDICTION AND VENUE**

3.    This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, inclusive of fees and costs, and because Defendant is domiciled in the State of Connecticut and Plaintiff in the State of Florida.

4.    Defendant is subject to personal jurisdiction in that it conducts and solicits business and derives substantial revenue from business conducted in the State of Connecticut.

1

5.      Venue is proper in the District of Connecticut under 28 U.S.C. §1391.

## III.      PROCEDURAL PREREQUISITES

6.      On January 25, 2019, Plaintiff filed a charge of discrimination against Defendants with the United States Equal Employment Opportunity Commission (EEOC) and with the Connecticut Commission on Human Rights and Opportunities (CHRO).

7.      On February 13, 2019, Plaintiff received a Notice of Right to Sue Letter from the EEOC regarding charge number 523-2019-00540 (Exhibit A). The CHRO claims are still pending.

## IV.      FACTS

8.      In or about August, 2015, Ms. Hahn relocated with her family from Norwalk, Connecticut to Fort Myers, Florida when she was hired by Gartner as an account executive.

9.      After completing a three-month training period, Ms. Hahn was placed on an otherwise all male team.

10.     Ms. Hahn consistently hit the company's quantitative metrics set in place to monitor success.

11.     On her first "blitz day" in January, 2016, Ms. Hahn booked a record of 19 meetings.

12.     Ms. Hahn's male teammates, Bryan Davies and Nate Snyder, frequently told her that they attributed her success was to her LinkedIn profile. They joked about creating fake LinkedIn accounts as women in order to book more meetings. Ms. Hahn's manager, Evan Livingston, also joined in on these types of discussions, agreeing that being a "nice young female [gave Ms. Hahn] a leg up when talking to prospects".

13.     During the first half of 2016, Ms. Hahn surpassed her team's retention goal,

signed a net new client and uplifted multiple accounts. In addition, she was widely recognized for signing a 70k "big deal" into a 3-year agreement.

14.     Due to her success, Ms. Hahn was also invited to participate in Leadership preparation training and to interview for a 2017 leadership position.

15.     Based on the company's recognition of her performance, Ms. Hahn was confident that her position was secure.  As a result, in August, 2016, Ms. Hahn set down permanent roots and purchased a house in Estero, Florida, near the Gartner office.

16.     Although Ms. Hahn was not promoted to leadership in her first year, Len Chisholm and Nate Swan told her that if she achieved Winner's Circle for 2016, she would be a top candidate for any leadership opportunities that might arise in 2017.

17.     However, in November, 2016, Regional Vice President Mark Queen reassigned to Ms. Hahn's territory a dead account from another account executive, Nate Snyder.  This resulted in a commission loss and clawback of over $10,000, making her 2016 Winners Circle goal unattainable.

18.     Despite being passed up for promotion and having her commission taken away, Ms. Hahn continued to be a top performer. On the last day of 2016, a Saturday, Ms. Hahn signed two new multi-year clients in the office.

19.     Ms. Hahn's coworkers who were promoted at this time included Joe Shaheen, Chris Cox, Tyler Eckert, Adam Twer, Michael Kiehn, Colin Labeau, and Chris Wilcox.

20.     Ms. Hahn received a top rating ("E") in her 2016 year-end appraisal, and her title was changed to "Account Executive", although her role and team remained the same.

21.     In 2017, Ms. Hahn continued to pursue her goal of moving into leadership. She became more actively involved across her team, region, and Gartner as a whole.

22.     Ms. Hahn was invited to become a regional champion, leading training for new hires.  In this role, she held meetings with her team twice a week in order to drive business results.

23.     In addition, Ms. Hahn supported the company as a whole as a "WinRoom" coach, meeting with account managers who were struggling to win business and helping them to close new deals.

24.     Ms. Hahn was also asked to participate in the Culture Committee, where she raised concerns about Gartner's "frat-like" image within the community. Per one of her suggestions to involve the local community, the committee hosted an event which was so successful that Ms. Hahn received approval to do it again the following week.

25.     2017 was Ms. Hahn's most successful year at Gartner. She sold new deals in each quarter, including $146.6K at Gartner's Symposium event and an additional $62.3K shortly after. This represented the largest amount of new business sold on site in her channel. Ms. Hahn also had 88% of her business renewed, which was the highest retention on her team.

26.     As a result of her success, Ms. Hahn was given Gartner's Club 300 status- the company's the highest recognition, reserved for the top 5% of sales executives globally.

27.     In mid-2017, Ms. Hahn interviewed for a manager position that had opened up. However, despite her exceptional performance, two males, William Glass and Austin Amour, were promoted instead. At that point, Austin Amour's business was already down over $300K for the year and he was at the bottom of the stack rankings.

28.     As feedback from her interview to explain why she had not received the promotion, Ms. Hahn was told that she needed to be "more approachable", and that the volume of her speech was "too loud" when she got excited during a presentation.

4

29.     At the end of 2017, Ms. Hahn reapplied for a promotion. Her male colleague, Evan Livingston, said that he expected her to be promoted that year because Gartner needed to increase its extremely low male to female leadership ratio.

30.     In mid-December, 2017, Ms. Hahn was informed that she was being promoted into a leadership role as of January 1, 2018.

31.     During the second week of January, 2018, a global sales manager kick off meeting was held to network and discuss new product training, time management and prioritization. Gartner provided unlimited alcohol at this meeting.

32.     Ms. Hahn was responsible for planning an offsite team kick off meeting to be held shortly after.  She was given no guidance or parameters by which to plan this event, other than reporting the date and venue to Regional Vice President Stephanie Crumbly.

33.     As Ms. Hahn's team day event, her team attended a baseball game at which everyone purchased beers and expensed them to Gartner.

34.     Gartner not only permitted but condoned the consumption of alcohol by employees at company-sponsored events, on a regular basis. Team managers including Evan Livingston, Clay Settles, Austin Amour, Colin Labeau, Larson Labeau, Mitch Wilson, Jeremy Russo, frequently organized happy hours at Fort Myers Brewery or at another one of the nearby bars.

35.     Gartner provided unlimited alcohol for the MSE channel quarterly outings at Fort Myers Brewery.

36.     In addition, Gartner regularly provided beer and pizza for employees working late into the evening at the end of each quarter.

37.     Each year during Ms. Hahn's employment, Gartner held an office beach day, at

5

which employees who had driven to the beach venue were provided with unlimited beer and wine.

38.     Other Gartner events at which alcohol was provided included; evenings at a local arcade, brunch with unlimited mimosas at the Naples Ritz, and beach days where account executives and managers bought beer and alcohol at a supermarket which they expensed to Gartner.

39.     During a Winners Circle trip attended by Ms. Hahn, employees were presented with cocktails upon their arrival at the hotel, followed by unlimited alcohol at every company sponsored activity.

40.     Gartner provided unlimited alcohol during the Club 300 trip to Shanghai, China, also attended by Ms. Hahn.  On the trip's theme night, CEO Gene Hall drank with the group all night.  On another evening, additional awards were given out with a bottle of champagne to each recipient, many of whom were later drinking out of the bottle on the dance floor.  CIO Mike Diliberto was also seen drinking throughout the trip.

41.     In May, 2018, Ashlee Horn ("Ms. Horn") took over as Regional Vice President. Ms. Hahn continued to receive only positive feedback about her performance.

42.     As an incentive to performance, Ms. Horn created a pipeline management competition.  The team with the most points based on June 2018 business results would be awarded a team day at the Hyatt Resort.

43.     At the end of June, Ms. Hahn's team had won the competition. Ms. Hahn received emails from MVP Val McClausland and GVP Greg Arlington congratulating her on her team's performance.

44.     By this time, Ms. Horn was out on maternity leave. Ms. Hahn sent her a text

informing her that Ms. Hahn's team had won the competition, and asking her to explain the parameters for scheduling and budgeting the day at the Hyatt.  Ms. Horn told Ms. Hahn to choose a day and said that she would get the details from the Hyatt.  She told Ms. Hahn that the company typically pays for the team to use the pool for a half day, and recommended bringing their "own alcohol and mixing drinks discreetly", because otherwise, "the price of drinks will spend the whole team budget in one day."

45.     However, Ms. Horn later found out that the Hyatt no longer issued day passes. Instead, she suggested that Ms. Hahn's team a rent a pontoon boat.  She told Ms. Hahn, "boat day would allow you guys more budget for food and drinks."

46.     When Ms. Hahn asked, each member of her team said that they would be agreeable to renting a boat instead of going to the Hyatt.

47.     Graham Scott said that he owned a boat and offered to drive.

48.     Jake Fleet said that he had rented a pontoon boat before, and also offered to drive.

49.     At Ms. Horn's suggestion, Ms. Hahn booked the boat day for July 27, 2018, at Snook Bight Marina.

50.     Prior to boat day, Ms. Hahn brought to the attention of interim RVP Stephanie Blower and HR partner Robert Bortman some challenges she had been facing with her team. Emily Irvine ("Ms. Irvine") had confided in Ms. Hahn that she felt isolated and disliked by the rest of the team.

51.     During a meeting Ms. Hahn had with Robert Bortman, she asked for advice about how to make sure the team got along on boat day. Ms. Hahn also discussed the boat day with Stephanie Blower.

52.     Another team's kick-off meeting took place on July 24, 2018. This event was a

pool party at manager Glenn Conner's house, where beer, wine, and lunch were provided and expensed to Gartner. On information and belief, attendees, including the host, drank alcohol throughout the afternoon.

53.     On July 26, 2018, Ms. Hahn's team made arrangements for boat day. Ms. Hahn would pick up some lite beer, champagne and a case of water.  Jake Fleet would bring a 12-pack of beer.  Ms. Hahn made it clear to the team that she would not allow them to drive home after drinking any alcohol, and instructed them to plan accordingly.

54.     On July 27, 2018, the team, including Ms. Hahn, Graham Scott, Jake Fleet, Jason Jerew, Jewel Jackson, Cortney Judson, Emily Irvine, Jorge Milan and Darryl Remedio, rented a boat under Ms. Hahn's name, with a Gartner corporate credit card.  All passengers were over the age of 21.  As the team had arranged, the boat would be driven by Graham Scott, who had assured Ms. Hahn that as the owner of a boat, he was an experienced driver and was also familiar with the area.

55.     Neither Gartner nor the boat rental company requested that any type of waiver or release.

56.     Some of the team members mentioned that several other Gartner teams with male managers had arranged boat days for the same day.

57.     Graham Scott drove the entire time the team was on the boat.

58.     When the team docked at Fort Myers Beach, Jake Fleet suggested that they go to Hooters, as another team had done. Ms. Hahn refused, explaining that she believed this to be an inappropriate use of company money.

59.     At about 11am, the team decided to leave early and head back for lunch. During the ride back, Ms. Hahn did not consume any alcohol, and encouraged the rest of the team to do

8

the same. Ms. Hahn sat in the back of the boat discussing lunch options with four other team members, while Graham Scott drove with the other team members, including Emily Irvine, sitting in the boat's front section.

60.     At about 11:30am, Ms. Hahn heard a scream.  Graham Scott turned the boat around immediately, at which point Ms. Hahn saw Ms. Irvine waving for help from the water. Jason Jerew and Jake Fleet jumped into the water to help her while Ms. Hahn called 911.

61.     After Ms. Irvine had been pulled out of the water, Ms. Hahn saw that she had severely injured her right leg.  Ms. Hahn rode with Ms. Irvine in the ambulance to the hospital and contacted her fiancé to notify him of the accident.

62.     At the hospital, Ms. Irvine explained that she had been sitting at the front of the boat, dangling her legs off the side, when she had slipped into the water underneath, kicked off the bottom of the boat and hit the propeller.

63.     At about 4 or 5pm on July 27, 2018, Ms. Hahn called Ms. Horn to notify her of the accident.  Unsure of what to do, Ms. Horn said that she would contact MVP Val McClausland.

64.     Later that evening, Ms. Hahn called Robert Bortman ("Mr. Bortman") to notify him of the accident and share the details of what had happened.  Mr. Bortman commended for having managed everything as well as possible under the circumstances.  He told Ms. Hahn to expect a follow up call from Val McClausland.

65.     Ms. Hahn instead received a text from Val McClausland later that night saying that she was sorry to hear of the accident.

66.     The night of the accident and over the weeks that followed, Ms. Horn repeatedly confirmed that Ms. Hahn had handled everything appropriately.  She indicated that the accident

would be filed as a worker's compensation claim, and assured her that Gartner intended to do everything it could to support Ms. Irvine and the team.

67.     At about 11pm on the night of the accident, Ms. Hahn received a text from Ms. Irvine informing her that the coast guard had found marijuana in Ms. Irvine's bag.

68.     The following day, July 28, 2018, Ms. Hahn visited Ms. Irvine in the hospital. Ms. Irvine told Ms. Hahn that she believed Cortney Judson ("Ms. Judson") had been the one to place the marijuana in her bag.  She told Ms. Hahn that she knew Ms. Judson had brought marijuana with her on the boat trip.  Ms. Hahn asked Ms. Irvine why she hadn't shared this information at the time, but Ms. Irvine said she didn't know. Ms. Hahn told her that it was completely inappropriate for anyone to bring drugs to a team offsite, and informed her that she would be discussing the situation with HR as soon as possible. Ms. Irvine told Ms. Hahn that what had happened was been a freak accident and not Ms. Hahn'sr fault.

69.     After leaving the hospital, Ms. Hahn contacted Mr. Bortman to share the information.  He thanked Ms. Hahn for telling him, assuring her again that she was doing everything correctly and that Gartner would support her through this traumatic situation.

70.     At that time, Gartner's company policy claimed, "*we strongly encourage you to report any situations you know about that may involve illegal, unethical or otherwise improper business activity, as well as all instances of employee violations of this Code of Conduct or any of the other Gartner policies. Doing so will allow the company to address the issue and take appropriate corrective action...**No Retaliation** You should have no fear of retaliation due to your report, as long as you have acted in good faith and believe what you reported to be true. The company will attempt to treat any such reports or discussions in confidence, subject to the need to conduct a thorough investigation where appropriate. Basically: See it, report it — and there*

10

*will be no retaliation.*"

71.     Coverage of the accident by the local news media did not include mention of alcohol consumption, or inappropriate behavior of any kind.

72.     During a forecasting meeting on July 30, 2018, Ms. Hahn's first day returning to work after the accident, Val McClausland asked about everyone's weekend then said to Ms. Hahn, "*well...I know about your weekend*".  She never asked Ms. Hahn how she was doing after the accident.

73.     The same morning, Mr. Bortman requested a meeting with Ms. Hahn in the HR offices.  He and a second HR partner, Kristen Vaughan, asked Ms. Hahn to go over what had occurred the day of the accident.  Ms. Hahn went through the day in detail again. She then inquired about counseling and leave for her team members. Mr. Bortman said that the team would be receiving information shortly.

74.     Over the following two days, the rest of Ms. Hahn's team members were each invited to one-on-one meetings with HR to provide statements. Rather than offering the team crisis management counseling as promised, HR instead drilled each team member about the accident.

75.     On July 31, 2018, Ms. Hahn asked to meet with Stephanie Blower to discuss the way to best address the rumor that had been circulating that Ms. Irvine was going to be fired for drug possession, and to request that support be provided for her team.

76.     After Stephanie Blower discussed the issue with Val McClausland, they determined that her team needed to be told to stop circulating these rumors, and instead concentrate on Ms. Irvine's recovery.

77.     Before addressing the team, Ms. Hahn, Stephanie Blower and Val McClausland

met with HR representatives Beatriz Fontanella and Robert Bortman to discuss the best way to handle the topic in order to avoid legal problems.

78.     Ms. Hahn expressed her concern that the rumors were being fueled by questions about the drugs found in Ms. Irvine's possession.  Mr. Bortman admitted that team members had been asked pointed questions about the drugs as part of the investigation, but he would not tell Ms. Hahn specifically what those questions were.

79.     Val McClausland requested that HR provide Ms. Hahn with extra support during this process, and asked that they check in with her daily to find out what the team needed. During this meeting, Ms. Hahn became visibly upset and even began crying.  However, HR never provided Ms. Hahn with any type of support.

80.     After the accident, it was clear that Ms. Hahn was struggling emotionally at work.

81.     Ms. Hahn found it difficult to pull herself together before walking into the office. However, she did her best to support her team members who were also struggling. Some of Ms. Hahn's colleagues and her former manager, Evan Livingston asked repeatedly if she was okay and expressed their concern over her uncharacteristically sad demeanor.

82.     Ms. Hahn shared her struggles with Val McClausland, Stephanie Blower, and Ashlee Horn, who each told her to just move on and continue business as usual.

83.     The team's morale continued to decrease. Ms. Hahn expressed to Val McClausland that the accident had been extremely distressing. Ms. Hahn repeatedly requested assistance in providing emotional support to the team, as the interrogations by HR were only exacerbating the problem. Val McClausland promised to follow up with HR again to make sure the team received the support it needed, and offered to look into the possibility of leave for the entire team. However, the team was never offered leave following the traumatic accident.

84.     On the evening of August 1, 2018, Ms. Hahn received a text from Val McClausland instructing her to inform her team that they were allowed to work from home for the remainder of the week.

85.     Later that evening, Mr. Bortman sent the team a template email with a list of techniques to handle a traumatic accident and a flyer on the company's Employee Assistance Program which included five complementary therapy sessions. Ms. Hahn was not able to use the therapy sessions at the time because the first session would not be available until the end of August.

86.     During the month of August, Ms. Hahn consistently worked late hours to keep up with the extra workload of Ms. Irvine's business in addition to managing her team.

87.     Mr. Bortman requested additional meetings to question Ms. Hahn further about the drugs found in Ms. Irvine's possession. Ms. Hahn told him repeatedly that she had no knowledge of the drugs at the time, and did not witness anyone smoking marijuana during the trip.

88.     During one of Ms. Hahn's meetings with Mr. Bortman, he also asked about her own alcohol intake on boat day. Mr. Bortman claimed that one of Ms. Hahn's team members had said that she had consumed most of the alcohol the team had purchased. Ms. Hahn emphatically denied this allegation.

89.     Mr. Bortman also questioned Ms. Hahn on Graham Scott's level of intoxication on boat day.  He claimed that a team member had told him that Graham Scott had consumed 12 beers.  Ms. Hahn told Mr. Bortman that she found this impossible to believe, considering that to her knowledge, there was only one 12-pack on the boat, with 10 people in total. Graham Scott had not appeared to be intoxicated. Both he and Ms. Hahn had been questioned by the coast

guard after the accident, who had found it unnecessary to perform sobriety tests.

90.     Throughout the process, Ms. Hahn was always extremely cooperative with HR and the Workers Comp team, who asked that Ms. Hahn provide a statement.

91.     During the month of August, Ms. Hahn received positive feedback from both Val McClausland and Ashlee Horn regarding her team's performance. During a combined team meeting with other managers, Val McClausland announced that Ms. Hahn's team had one of the highest multiyear rates of 71%, and early renewals of 53%.

92.     Ms. Horn told Ms. Hahn that she had the highest percentage of Q1 retention for the region, bringing her extremely close to the goal she had set.  Ms. Hahn was excited to share this news with the team.

93.     Ms. Hahn's team was in a phenomenal position for 2019 due to their strategy of focusing on multi-year contracts. Ms. Hahn shared with Ms. Horn that she had already achieved 93%+ retention for her 2019 business and had multiple opportunities in the works to increase this percentage before the end of quarter.

94.     Ms. Horn commended Ms. Hahn for her impact on the team, particularly given that Ms. Hahn was the manager with the least tenure on the floor.

95.     After the routine "manager effectiveness" meeting with Ms. Hahn's team at the end of August, Ms. Horn reported that her team members had nothing but positive feedback about her, and were very appreciative of all the help she had provided over the year.

96.     On what was to be her final day at Gartner, August 31, 2018, Ms. Hahn had no indication that she was about to be fired.  Ms. Hahn's team members began receiving meeting requests from HR during a routine team meeting.

97.     Jason Jerew told Ms. Hahn that Cortney Judson had been questioned about

something that she had brought on the boat during boat day, but that she had not shared with him the specifics. She had been asked to sign a zero-tolerance policy.

98.    Graham Scott told Ms. Hahn that he assumed the investigation had revealed that it had been Cortney Judson who had brought the "stuff" on the boat.  After his meeting with HR, Graham Scott reported that he had also been asked to sign a zero-tolerance policy.

99.    Later in the day, a meeting was scheduled with HR in Ms. Hahn's calendar for 3:30 that afternoon. A separate mandatory meeting was also scheduled at 3:30 for the rest of her team.

100.    Present at her HR meeting were Robert Bortman, Ashlee Horn, and Val McClausland.  Mr. Bortman told Ms. Hahn that Gartner had decided to make an example of her, and that today would be her last day of work.  He said that drinking alcohol at a Gartner-sponsored function was a "violation of company policy". Val McClausland immediately tried to correct Mr. Bortman's statement by saying, "*what I think Robert was trying to say, is that someone in leadership drinking at a work function is not an example they wanted for a manager at the company.*"

101.    In truth, this was exactly the type of leadership Ms. Hahn had witnessed countless times over the course of her three years at Gartner, from her male direct manager all the way up to the male Operating Committee members and the company's CEO.

102.    Moreover, Gartner had no such policy in place prohibiting alcohol at company functions.  In fact, the company's policy expressly provided, "*[y]ou may consume alcohol, in reasonable quantities, if it is provided by the company at a company or other business-related function, and only if your consumption does not interfere with your duties at the function or the company's reputation.*"

15

103.    Virtually all of Gartner's team building events included alcoholic beverages.

104.    Ashlee Horn said nothing during the meeting, despite having known in advance that alcohol would be available on the boat, and having previously instructed Ms. Hahn to smuggle alcohol into the Hyatt pool area.

105.    When Ms. Hahn brought up the obvious inconsistencies, she was told there would be no discussion and that the decision had been made.

106.    Val McClausland assured Ms. Hahn that she would be paid on her two outstanding contracts.

107.    Jake Fleet, the account manager for one of Ms. Hahn's outstanding contracts, later informed her that it had been returned.  However, Ms. Hahn never heard back from Gartner regarding the other contract.

108.    Ms. Hahn was escorted out of the building and told that she would receive her personal belongings and remaining PTO and commission compensation within the next month.

109.    Several items were missing from the box of belongings that was returned to Ms. Hahn, including two empty Champagne bottles that, like all of her coworkers, Ms. Hahn had prominently displayed on her desk as a token of her achievements. One of the bottles had been given to her to toast her accomplishment of making "Winner's Circle", and the date of the achievement was written on the cork. The other had been given to toast her accomplishment of achieving "Club 300".  Again, as was a Gartner tradition, the date was written on the cork.

110.    Ms. Hahn immediately emailed Ms. Horn with a list of items that were missing. After several email exchanges over the course of more than two weeks, Ms. Hahn received the remainder of her belongings, which included the two champagne trophy bottles and a beer kozie, also given to her by Gartner.

111.    After a month had passed and Ms. Hahn hadn't received the pay-out check for her PTO time, she contacted Mr. Bortman. He blamed the delay on a "glitch" and assured her that a check would be issued on October 15, 2018.

112.    After Ms. Hahn's termination, many of her former team members reached out to express their concern about the way she was treated, and to thank her for her help and support as their leader and manager.

113.    The team had many notable achievements since Ms. Hahn left Gartner.  Within just one month of Ms. Hahn's termination, two members of the team achieved Winners Circle- a rare achievement that early in the year.

114.    In addition, Ms. Hahn would likely have been eligible for the Q3 $10,000 bonus.

115.    Ms. Hahn's retention rate had been on target to be her highest by far during the course of her three years at Gartner.

116.    Overall, 2019 was likely to have been Ms. Hahn's most successful year yet.

117.    Gartner further tarnished Ms. Hahn's reputation by alleging "misconduct unrelated to work", as the reason for her termination on her unemployment record.

118.    Since Ms. Hahn's termination, Gartner has updated its personnel policies. Notably, the policy now dictates that managers*, [d]o not tolerate drugs or alcohol when working and have zero tolerance for the use, sale or purchase of any illegal substance at any work-sponsored event."*

119.    Gartner's new policy further dictates, *"[w]hen associates raise a concern, managers need to...Maintain confidentiality. To the extent possible, protect the associate's privacy. Avoid discussing the conversation with others on your team. Reach out to an HR partner."*

17

120.    Like the old policy, the new policy assures managers that, "*there will be no retaliation for asking questions or raising good-faith concerns*" for reporting to HR, *"a situation that you believe violates the Code or any other Gartner policy"*.

121.    On information and belief, since Ms. Hahn's termination, male managers at Gartner continue to hold alcohol driven team building events without any repercussions.

122.    On October 4, 2018, Gartner posted a photo from a team pub drinking event hosted by male manager, Chris Wilcox, to advertise the company's work culture on Linkedin.

123.    During the Gartner Symposium event in October, 2018, Ms. Hahn saw Chris Wilcox and three members of his team drinking alcoholic beverages at a bar.

124.    Photos of a Gartner team holiday party hosted by Robert Bortman, which included alcoholic beverages appeared on social media channels including Facebook.

125.    On information and belief, Val McClausland was removed from her leadership position and reassigned to another roll in the company.

126.    On information and belief, Gartner did not permit MSE team kick off events to be held off site in 2019.

127.    On information and belief, as designated host of the 2019 beach day, the Quota team required attendees to sign documents acknowledging that alcohol would not be permitted.

**V.    COUNT ONE:        UNLAWFUL GENDER DISCRIMINATION
                        PURSUANT TO TITLE VII**

128.    Paragraphs 1-127 are incorporated by reference herein.

129.    Ms. Hahn can successfully establish a prima facie case of employment discrimination based on gender by showing that: (i) that she was a member of a class (female) protected under Title VII of the 1964 Civil Rights Act ("Title VII"); (ii) that she was otherwise

qualified for her position at Gartner; (iii) that she suffered an adverse employment action when she was terminated; and (iv) that her termination occurred under circumstances giving rise to an inference of gender discrimination.

130.    Ms. Hahn is a member of a protected class because of her gender (female).

131.    Ms. Hahn was inarguably qualified for her position. She routinely surpassed each of the company's markers measuring employee success. Despite the obstacles placed in her way, Ms. Hahn was promoted to a leadership position, where she continued to excel.

132.    Despite Ms. Hahn's exemplary performance, Gartner summarily terminated her employment for allegedly violating of company policy. Ms. Hahn was told that Gartner had decided to make an example of her, after one of her team members was injured in an accident that occurred when the team had been drinking alcohol.

133.    Gartner cannot establish a legitimate explanation for its decision to terminate Ms. Hahn.  Ms. Hahn can produce evidence to demonstrate that her gender was a substantial and motivating factor for Gartner's decision to terminate her.

134.    Gartner treats female employees less favorably than it does similarly situated male employees.

135.    Initially, Ms. Hahn was passed over twice for a promotion, in favor of several lower performing male employees. Ms. Hahn was told that this was because she sometimes spoke "too loud[ly]" during presentations, and that she needed to be "more approachable".

136.    Ms. Hahn's success at Gartner was met with a general attitude of resentment from her male colleagues.  Several of her male teammates, frequently attributed her success to her LinkedIn profile, joking about creating their own fake LinkedIn accounts as women in order to book more meetings. Ms. Hahn's manager openly agreed that she had "a leg up when talking to

prospects" due to the fact that she was a "nice young female".  When Ms. Hahn raised her

concerns to the Culture Committee about Gartner's "frat-like" image within the community,

nothing was done to address them.

137.    The reason given for Ms. Hahn's termination- violation of company policy- is

unworthy of credence.  Gartner maintained a policy that not only permitted, but condoned the

consumption of alcohol at its frequently held company-sponsored events. Gartner's policy at the

time expressly provided, "[y]ou may consume alcohol, in reasonable quantities, if it is provided

by the company at a company or other business-related function, and only if your consumption

does not interfere with your duties at the function or the company's reputation."

138.    Over the course of Ms. Hahn's three years employment, Gartner actively

condoned the provision and consumption of alcohol on countless occasions by male employees

in all positions, from male team managers to male Operating Committee members and

executives.

139.    It was Ms. Hahn's supervisor who recommended renting a pontoon boat for team

day, explaining to Ms. Hahn that, "boat day would allow you guys more budget for food and

drinks."

140.    In addition to Ms. Hahn's team, several other Gartner teams with male managers

held team boat days on July 27, 2018.  Another team held a team day pool party at the home of a

male manager, where employees, including the host, drank alcohol provided at Gartner's

expense.

141.    As team leader, Ms. Hahn fully complied with company protocol throughout the

team day outing. However, through no fault of her own, one of Ms. Hahn's team members was

injured.  In the weeks that followed, Ms. Hahn was repeatedly assured by management that she

had handled the emergency in the best way possible under the circumstances.

142.     Since Ms. Hahn's termination, Gartner has updated its personnel policies.

Notably, the policy now dictates that managers, "[d]o not tolerate drugs or alcohol when working

and have zero tolerance for the use, sale or purchase of any illegal substance at any work-

sponsored event."

143.     However, since Ms. Hahn's termination, male employees at Gartner continue to

hold alcohol driven events without any repercussions. Apparently, Gartner's new prohibition on

alcohol only applies retroactively, to female managers.

144.     Ms. Hahn was treated less favorably than similarly situated male employees

because of, and substantially because of her gender.

145.     Ms. Hahn respectfully requests that Gartner be held liable on this claim and that

all appropriate relief be awarded in her favor.

**VI.     COUNT TWO:          RETALIATION FOR PROTECTED ACTIVITIES
                              PURSUANT TO CONNECTICUT WHISTLEBLOWER
                              STATUTE**

146.     Paragraphs 1-145 are incorporated by reference herein.

147.     Ms. Hahn can successfully establish a prima facie case of retaliation under

Connecticut whistleblower statute by demonstrating that: (1) she engaged in protected activity as

defined by the statute; (2) she was subsequently discharged; and (3) there was a causal

connection between her participation in the protected activity and the adverse action (Conn. Gen.

Stat. Ann. § 31-51m).

148.     Ms. Hahn engaged in protected activity when she reported the possession of drugs

by a coworker. When Ms. Hahn learned that one of her team members had taken marijuana onto

the boat they had rented on team day, she immediately reported the information to Human

21

Resources. Ms. Hahn remained helpful throughout the investigation that followed, and was assured repeatedly that she acted according to proper protocol.

149.    In reporting the incident to Human Resources, Ms. Hahn complied not only with state and federal public policy, but with Gartner's own company policy, stating, "we strongly encourage you to report any situations you know about that may involve illegal, unethical or otherwise improper business activity, as well as all instances of employee violations of this Code of Conduct or any of the other Gartner policies....You should have no fear of retaliation due to your report, as long as you have acted in good faith and believe what you reported to be true."

150.    Despite Ms. Hahn's exemplary conduct, Gartner decided to "make an example" out of her by terminating her employment.  In doing so, Gartner violated its own anti-retaliation policy, as well as the clear public policy prohibiting the penalization of an employee for reporting misconduct.

151.    A clear causal connection between Ms. Hahn's reporting of drug possession by her coworker and her termination.  Immediately prior to her termination, Ms. Hahn's team members had been asked to sign a zero-tolerance drug policy. Gartner terminated Ms. Hahn in order to "make an example" for remaining employees.  As there were absolutely no incidents of misconduct on Ms. Hahn's own record, her termination can only be attributed to her reporting the misconduct of a coworker.

152.    Ms. Hahn respectfully requests that Gartner be held liable on this claim and that all appropriate relief be awarded in her favor.

## VII.    COUNT THREE:    BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

153.    Paragraphs 1-152 are incorporated by reference herein.

22

154.    Gartner had a good faith duty to honor its non-retaliation policy, and to apply company policies consistently among its employees.  Gartner also had a duty not to discriminated against Ms. Hahn substantially because of her gender, but did so with a willful intent to violate her employment rights.

155.    Gartner acted in bad faith when, after commending Ms. Hahn repeatedly for her leadership and for her handling of an emergency situation, it suddenly changed courses and targeted her for dismissal.

156.    Gartner's given reason- that Ms. Hahn violated a non-existent company policy prohibiting alcohol- is asserted in bad faith.  Ms. Hahn had no history of violating any company policy.  Most importantly, to the extent that any policy does exist to prohibit the consumption of alcohol, such policy is violated routinely, by virtually every other Gartner employee, none of whom have faced any adverse actions.

157.    Ms. Hahn respectfully requests that Gartner be held liable on this claim and that all appropriate relief be awarded in her favor.

**VIII.      DEMAND FOR RELIEF**

WHEREFORE, Erica Hahn hereby requests the following relief:

A.    Award compensatory damages;

B.    Award punitive and liquidated damages;

C.    Award attorneys' fees and costs;

D.    Award pre-judgement interest;

E.    Award post-judgement interest;

F.    Award such other relief in law or equity as this Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.

Respectfully Submitted,
PLAINTIFF
ERICA HAHN

By:/s/ Mark Carey
Jill Saluck (ct30331)
Mark P. Carey (ct17828)
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
jsaluck@capclaw.com

HER ATTORNEYS

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY, that the foregoing was filed electronically via ECF on this the 9th day of May, 2019, and delivered via email and regular mail, postage prepaid to all those unable to receive electronic filings via ECF.

Daniel A. Schwartz, Esq.
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
dschwartz@goodwin.com


<u>/s/ Jill Saluck</u>
Jill Saluck

# EXHIBIT A

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:   **Erica Hahn**
      **20552 Ardore Lane**
      **Estero, FL 33928**

From:  **Boston Area Office**
       **John F. Kennedy Fed Bldg**
       **Government Ctr, Room 475**
       **Boston, MA 02203**

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2019-00541 | **Linda E. Ingle,** **Investigator** | **(617) 565-3194** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Kenneth An*

**Feng K. An,**
**Area Office Director**

FEB **1 1** 2019

*(Date Mailed)*

Enclosures(s)

cc:
Director of Human Resources
**GARTNER INC.**
**50 Top Gallant Road**
**Stamford, CT 06902**

**Mark Carey, Esquire**
CAREY & ASSOCIATES, PC
**71 Old Post Road Suite One**
**Southport, CT 06890**